FILED
05/01/2026
Clerk of the
Appellate Courts

IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
January 13, 2026 Session

## STATE OF TENNESSEE v. MIRACLE A'SHA BAILEY AND ROBERT JAYLEN HOLLAND

**Appeal from the Circuit Court for Montgomery County**
**Nos. CC-2023-CR-11, CC-2023-CR-10  William R. Goodman, III, Judge**

_____

**No. M2024-01144-CCA-R3-CD**
_____

In January 2023, the Montgomery County Grand Jury issued a four-count indictment charging Miracle A'sha Bailey ("Defendant Bailey") and Robert Jaylen Holland ("Defendant Holland") with first degree premeditated murder (Count 1), evading arrest in an automobile causing a risk of death or serious bodily injury (Count 2), and theft of property valued at more than $10,000 (Count 3).  Defendant Holland was also charged with evading arrest (Count 4).  Following a joint trial, the jury convicted Defendant Bailey of first degree premeditated murder and the lesser-included offenses of evading arrest in an automobile in Count 2 and joyriding in Count 3, for which the trial court imposed an effective life sentence.  The jury convicted Defendant Holland of first degree premeditated murder, evading arrest in an automobile causing a risk of death or serious bodily injury, the lesser-included offense of joyriding in Count 3, and evading arrest, for which the trial court imposed an effective life sentence.

On appeal, Defendant Bailey contends that (1) the trial court erred by admitting a detective's body camera recording of a doorbell camera video; (2) the chain of custody for her cell phone and the victim's cell phone was insufficiently established; (3) the trial court erred by admitting autopsy photographs; (4) the trial court erred by finding that the automobile's owner was not a material witness; (5) the trial court erred by failing to instruct the jury on identity; and (6) the trial court erred by instructing the jury on flight.  For his part, Defendant Holland contends that (1) the evidence was insufficient to support his conviction for first degree premeditated murder; (2) the trial court erred by failing to instruct the jury on identity and by issuing an "inaccurate" instruction on flight; (3) his right to confront witnesses was violated when the trial court allowed an expert witness to testify who did not perform the gunshot residue ("GSR") testing; and (4) the trial court erred by admitting autopsy photographs.  After a thorough review of the evidence and applicable case law, we affirm.  We also determine that there is a clerical error in Defendant Holland's judgment form in Count 2 and remand for entry of a corrected judgment.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Circuit Court Affirmed; Defendant Holland's Case Remanded**

ROBERT L. HOLLOWAY, JR., J., delivered the opinion of the court, in which TIMOTHY L. EASTER and JILL BARTEE AYERS, JJ., joined.

Erin S. Poland, Clarksville, Tennessee, for the appellant, Miracle A'sha Bailey.

Mitchell A. Raines, Assistant Public Defender—Appellate Division (on appeal); Roger E. Nell, District Public Defender; and Robert P. Koewler and Crystal M. Lewis (at trial), Assistant District Public Defenders, for the appellant, Robert Jaylen Holland.

Jonathan Skrmetti, Attorney General and Reporter; Elizabeth H. Evan, Assistant Attorney General; Robert J. Nash, District Attorney General; and Michael T. Pugh and Dillon E. Barker, Assistant District Attorneys General, for the appellee, State of Tennessee.

## OPINION

## I. Factual and Procedural Background

This case arises from the December 8, 2021 shooting death of seventeen-year-old Arahmonie Majors ("the victim"). Defendants Bailey and Holland were eighteen years old at the time. The proof at trial established that, on the evening of December 8, the victim was living with his aunt in Clarksville's Deer Trail subdivision, which included Whitetail Drive and Buckshot Drive. Defendant Bailey contacted the victim on Instagram and asked him to meet her. When the victim walked to the location on Whitetail Drive where he was to meet Defendant Bailey ("the shooting scene"), he was shot fourteen times. Neighbors saw a Jeep speed away, and the police issued a "be on the lookout" ("BOLO") dispatch for the vehicle. After spotting a Jeep matching the description, officers attempted to initiate a traffic stop. A pursuit ensued, and the Jeep stopped in the Lincoln Homes housing project ("Lincoln Homes"). Defendant Holland, who was driving, and three passengers fled on foot. Officers chased and arrested Defendant Holland, and an officer found a Glock pistol on the ground in Defendant Holland's flight path. Social media records led to Defendant Bailey's subsequent arrest. Officers also determined that the Jeep had been reported stolen.

At trial, Nicholas Leslie testified that, on the evening of December 8, 2021, he was standing outside of his garage in the Deer Trail subdivision when he heard gunshots and saw a vehicle "leave at a high rate of speed," prompting Mr. Leslie to call 911. The recording of the 911 call, which was placed at 8:41 p.m., was received as an exhibit. In the recording, Mr. Leslie reported that he heard six or seven gunshots from the direction of

Buckshot Drive and that he saw a dark blue or black Jeep Cherokee or a similar four-door SUV speeding out of the neighborhood.

Mr. Leslie testified that he was a car enthusiast and that he could identify the Jeep because his brother drove the same type of vehicle. He noticed that one passenger sitting in the front seat of the Jeep had blonde hair. Mr. Leslie, who was a career firefighter, ran to the scene when he heard a woman screaming. He saw a woman standing outside a sedan, and the victim lying on the ground bleeding. Mr. Leslie asked a neighbor, Josef Holler, if anyone had taken the victim's pulse, and Mr. Holler answered that there had been a pulse, but it was gone. Mr. Leslie prepared to perform CPR, but Clarksville Police Department ("CPD") officers arrived and told him to move away from the victim.

On cross-examination, Mr. Leslie testified that CPD officers did not ask him to identify whom he saw in the Jeep. Mr. Leslie acknowledged that he did not tell the 911 dispatcher about having seen a person with blonde hair. He agreed that he could not identify Defendant Bailey as having been in the Jeep.

Lashanda Richardson testified that, on December 8, 2021, she was driving home and saw an SUV come out of Deer Trail subdivision "speeding." She noted that the roads were narrow and dark and that the SUV almost hit her after running a stop sign. As Ms. Richardson entered the subdivision, she saw the victim's tennis shoes in her rearview mirror, and she turned around and exited her car. Ms. Richardson walked toward the victim, called 911, and began screaming for help.

Ms. Richardson's 911 call recording was received as an exhibit and reflected that, at 8:43 p.m., Ms. Richardson reported that a young Black man with dreadlocks had been shot. A male voice in the background, whom Ms. Richardson identified as Mr. Holler, provided the address, and at least one other voice was audible. Mr. Holler and Ms. Richardson stated that the victim had a faint pulse, was not breathing, and appeared to have been shot in the back of the head based upon the amount of blood that was pooling beneath him. Ms. Richardson relayed that Mr. Holler had seen a "small Ford" drive away. Ms. Richardson stated that she had just stepped on a shell casing and that there were a lot of shell casings on the ground. The 911 operator asked her to have everyone back up from the area. On cross-examination, Ms. Richardson testified that she did not see any people or vehicles around the victim's body when she first approached him.

Mr. Holler testified that, on December 8, 2021, he and his wife were in bed when he heard gunshots; he went out onto his front steps and saw a dark-colored car or SUV "fly by" traveling toward the subdivision entrance. Mr. Holler stated that he saw the victim in the road, walked to him, and checked his pulse; he noted that he saw the victim "fade off." Mr. Holler said that the victim's cell phone began ringing and that he answered it. The

caller asked if the victim was okay, and Mr. Holler responded negatively before dropping the phone.

Mr. Holler acknowledged that he initially told Ms. Richardson that the vehicle was a small Ford. He stated that he told the police that the vehicle was a black Jeep about ten minutes later because he "remember[ed] more and more" as time passed. Mr. Holler noted that he had worked on cars his entire life. Mr. Holler stated that a school bus was usually parked on the street in the subdivision. Mr. Holler stated that the police took him to Lincoln Homes and showed him a Jeep, which he identified as the vehicle he saw.

On cross-examination, Mr. Holler testified that he gave a written police statement after he identified the Jeep. After reviewing the statement, Mr. Holler agreed that he had described the vehicle as a black SUV. He further agreed that the police informed him that they had a "suspect vehicle" while driving him to Lincoln Homes. Mr. Holler stated that he identified the Jeep as the vehicle as soon as they pulled up to the site and said that he was confident in his knowledge of vehicles.

On redirect examination, Mr. Holler agreed that he told an officer that the vehicle was a black Jeep before they went to Lincoln Homes.

Jalaysia[1] Johnson testified that, on December 8, 2021, she lived on Whitetail Drive with her mother, Shatika Johnson, her two siblings, and the victim, who was her cousin. Jalaysia stated that she, her brother, and the victim went to the grocery store; when they returned home, they began putting away the groceries when the victim received a call through Instagram. Jalaysia noted that the victim and her brother shared a cell phone ("the victim's phone") and that the victim's Instagram account was also connected to Jalaysia's phone, meaning that she received notifications when someone called the victim on Instagram. Jalaysia stated that she heard a female voice say, "I see a school bus," and the victim went outside. Jalaysia said that, two minutes later, she heard eleven gunshots. Jalaysia told Shatika that the victim was not inside the house, and Shatika called the victim's phone. A man answered and told them that the victim was in the street. Shatika, Jalaysia, and her siblings drove around the neighborhood together until they saw the victim and exited the car.

Jalaysia testified that she later gave the police the name of the account that had called the victim on Instagram. Jalaysia stated that, although she received the victim's Instagram notifications, she generally did not open them. She did not know if anyone had access to the account other than her brother, the victim, and herself.

---

[1] Because both Jalaysia and Shatika Johnson testified at trial, we will refer to them by their first names for clarity. We intend no disrespect in doing so.

On cross-examination, Jalaysia testified that about five people were at the scene when they arrived. She stated that none of them got close enough to touch the victim. When asked about her preliminary hearing testimony that the victim had her cell phone when he was shot, Jalaysia clarified that the victim had her brother's phone.

Shatika testified that, at the time of the victim's death, he had been living with her family for about two months. She stated that the victim shared Jalaysia's and her son's cell phones. Shatika noted that the children were not allowed to bring friends to her house. Shatika said that, on December 8, 2021, she was upstairs checking the children's computers for school assignments when she heard them return from grocery shopping. Shatika stated that, a couple of minutes later, she heard "repetitive" gunshots. Shatika said that her son ran to her and told her that the victim "went outside to meet a girl."

Shatika testified that she called the victim's phone and that a man answered and told her the victim had been shot. Shatika drove in the direction from which she heard the gunshots and saw the victim lying on the ground. Shatika stated that a man tried to stop them from getting close to the victim, and police officers told her that she and her children did not want to see him.

CPD Officer Sarah Sager testified that she was the first officer to arrive at the scene of the shooting. Officer Sager stated that she saw a man, whom she identified as Mr. Holler, performing CPR on the victim and that she assisted him; Mr. Holler told her that he had pushed or thrown a cell phone aside. Officer Sager checked the victim's pulse and informed dispatch that he was likely deceased. Mr. Holler told Officer Sager about a dark-colored SUV, which he believed to be a Jeep Cherokee, that he had seen on the side of the road and fleeing the area after the gunshots. Officer Sager later drove Mr. Holler to Lincoln Homes, where her supervisor, Sergeant Nick Newman, walked Mr. Holler to the location of a vehicle.

Montgomery County Sheriff's Office ("MCSO") Sergeant Jason McClung testified that he was the assistant director of the 19th Judicial District Drug Task Force and that he and Agent Jonas Jackson overheard the shooting call put out by CPD and a BOLO for a dark-colored Jeep or other SUV. The officers decided to assist and began driving toward the scene when a SUV traveling in the opposite direction passed them going between ten and fifteen miles over the speed limit. They turned around and followed the SUV; when Agent Jackson activated his blue lights and siren, the SUV sped up. The SUV drove to Lincoln Homes and stopped; four people "bail[ed]" out and ran away. Sergeant McClung testified that he ran after the driver, whom he identified as Defendant Holland. He stated that Defendant Holland was wearing red sweatpants and a grey or white hoodie.

A surveillance recording from Lincoln Homes was received as an exhibit. The recording was time-stamped 8:51 p.m. on December 8, 2021; the camera overlooked a

curved road in the foreground, which intersected a road and parking area that ran up the middle of the camera frame. A long, one-story building was in the top left of the camera frame, and a grassy area was in front of the building. At 8:55 p.m., four people were visible running out from behind the long building. The first person continued straight and exited the upper right camera frame; due to the low lighting, the person's clothing was not visible. The second person turned left and ran along the side of the long building before running toward the camera, turning right past parked cars, and exiting the right camera frame; this person wore a red hoodie and dark pants. The third person also ran along the side of the long building but stopped and hid in the building's shadows; the person's clothing was also not visible. The fourth person briefly ran down the street toward the camera before turning left, running through a grassy area, and exiting the left camera frame; the person was wearing a white sweatshirt. Shortly after, a police officer ran in the direction of the fourth person, and another followed a few seconds later. After both officers had passed, the third person exited the left camera frame by running along the side of the long building. A third police officer ran through the camera frame. At 8:59 p.m., two officers walked a handcuffed man, who was wearing a white sweatshirt and red pants, in the direction from which they originally came.

Sergeant McClung testified that he found Defendant Holland hiding in the shadow of a storage shed. Sergeant McClung held Defendant Holland, who was wearing a ski mask over his face, at gunpoint until other officers arrived. Agent Jackson and another officer escorted Defendant Holland back to their vehicles while Sergeant McClung walked along the flight path to see if Defendant Holland had discarded any items. Sergeant McClung found a Glock pistol in an area containing a basketball court and a sandbox.

On cross-examination, Sergeant McClung testified that he did not file a police report in connection with the pursuit. He agreed that "someone identified three [B]lack males in the car, initially." Sergeant McClung denied that he saw Defendant Holland drop the Glock pistol or the pistol's hitting the ground, and he agreed that he briefly lost sight of Defendant Holland as they ran around a building. Sergeant McClung stated that he did not see anyone else in the area. When discussing the person who ran in the same general direction as Defendant Holland, Sergeant McClung agreed that between two and a half and three and a half minutes passed from the time the officers ran out of frame and when they walked Defendant Holland back through the area shown on the recording.

Agent Jackson testified consistently with Sergeant McClung regarding the events leading to the four occupants of the Jeep fleeing on foot at Lincoln Homes. Agent Jackson stated that he saw a man he later identified as Defendant Holland wearing a white or light-colored hoodie and red sweatpants. Agent Jackson stated that he ran after Sergeant McClung after placing his police cruiser in park. When Agent Jackson caught up to Sergeant McClung at the storage shed, he noticed that Defendant Holland was wearing a

ski mask, which he collected and put in his police vest. Agent Jackson forgot about the mask until he removed his vest later that evening, at which point he turned it over to CPD.

On cross-examination, Agent Jackson testified that he wrote an arrest report and acknowledged that his report did not mention the ski mask. Agent Jackson stated that police dispatch initially stated that the vehicle was a "dark-colored Jeep or Hummer," which he included in his report. He added that dispatch "came back later and said that it was a Jeep." Agent Jackson agreed that his report reflected that "four males" exited the SUV.

Sergeant Newman testified that he responded to Lincoln Homes, met Mr. Holler, and walked with him to the Jeep; Mr. Holler identified the Jeep as the vehicle he saw. Sergeant Newman stated that a deputy at the scene gave him two cell phones and that he put both phones in "airplane mode" to prevent the phone from being "remotely wipe[d.]" Sergeant Newman testified that he took the phones to the Special Operations Unit office ("S.O.U. office") and placed them on a table in a secure area called the "war room." Sergeant Newman testified that he transported the cell phones to the S.O.U. office and that Officer Benjamin Trivett transported Defendant Holland to the police department. Sergeant Newman was responsible for maintaining the phones.

Officer Trivett's body camera recording was received as an exhibit and showed Officer Trivett and Sergeant Newman patting down Defendant Holland. Another officer handed a cell phone to Officer Trivett and another to Sergeant Newman. Officer Trivett placed the cell phone into airplane mode and placed both cell phones on top of a plastic box in the police cruiser's trunk and closed it.

Sergeant Newman recalled speaking to the victim's mother on the street at the shooting scene. A portion of Sergeant Newman's body camera recording was played for the jury and entered as an exhibit. In the recording, when Sergeant Newman asked whether the victim had any trouble in Nashville, the victim's mother stated they had problems with a neighbor who was too old to be pursuing a relationship with the victim. The victim's mother noted that the neighbor's boyfriend had threatened the victim on the previous Friday.

Detective Benjamin Goble testified that he became the lead investigator in this case in October 2023 when Detective Brian Hughes accepted a job at another police department. Detective Goble said that on December 8, 2021, he responded to the shooting scene and spoke with two of the victim's family members. Detective Goble stated that they informed him that Jalaysia had seen the victim having a video call with a girl and that he had left their house prior to the gunshots. Jalaysia pulled up the victim's Instagram account on her cell phone and showed Detective Goble the last account with which the victim

- 7 -

communicated, which had the username "Mirr2shiesty." Detective Goble stated that the last communication was a video call, but the call itself was not recorded.

Detective Goble testified that, while he was speaking to Jalaysia later that evening, he saw on her cell phone that the name of the Mirr2shiesty Instagram profile had been changed to "BarbiedollMir." He also saw that the victim's profile "no longer had access" to the BarbiedollMir account, although it still showed the record of their previous communications. Detective Goble reviewed those messages and discovered an address that he eventually connected to Defendant Bailey.

After speaking with Mr. Holler, Detective Goble went to a neighbor's house across from the shooting scene. There, Detective Goble reviewed surveillance footage from a home's doorbell camera and recorded the footage using his cell phone. Detective Goble's body camera also recorded the neighbor's cell phone screen while it played the surveillance footage.

The State moved to enter a recording from Detective Goble's body camera as an exhibit. At this point, defense counsel[2] requested a jury-out hearing and raised an objection based upon Tennessee Rule of Evidence 1002, arguing that the best evidence of the recording was the video file itself or "the cell phone video that Detective Goble took of that." Defense counsel noted that "you can't see what's happening on the phone." The State responded that Detective Goble would testify that nothing was visible on the original doorbell camera video and that it was "just sound."

After playing the recording, the State argued that the sound of the gunshots was consistent with the number of cartridge casings recovered at the scene. When the trial court observed that the audio was "the original audio that's coming in via the body-cam of Detective Goble," defense counsel argued that "the person who . . . could authenticate that isn't here to testify" and that counsel did not know "if that's original[.]" Defense counsel noted that Detective Goble and the other person discussed "that there's at least something that could be seen" on the video "because you could see headlights." Defense counsel also argued that a possible fact issue existed regarding the type of vehicle that left the scene and that the video did not have a timestamp.

The State responded that copies of the doorbell recording were admissible and that Detective Goble would testify that he observed the original video and that the only thing visible on the video was "maybe a shadow . . . , lights kind of in the darkness."

---

[2] Defendant Holland's counsel raised the initial objection, and Defendant Bailey's counsel joined it during the jury-out hearing.

The trial court overruled the objection, finding that the body camera recording reflected Detective Goble's investigation and did not purport to be a duplicate of the neighbor's video. The court noted that "we've had numerous introductions of body-cams," some of which included eyewitnesses' statements.

After the jury returned, Detective Goble testified that a neighbor who lived near the shooting scene showed him a video on her cell phone from her doorbell camera. Detective Goble stated that the only thing visible in the recording was "[s]ome beams of light" coming from off camera and pointing in the direction of Whitetail Drive. He noted that he did not see the front of a vehicle in the doorbell recording but only the beams of light.

Detective Goble testified that, later that evening, he returned to the S.O.U. office and turned in five cell phones to CPD Detective Debra Kolofsky, who was their "Mobile Forensic Examiner." At this point, Defendant Holland's counsel raised a chain of custody objection to two of the cell phones: "iPhone Model A1660 (Holland) and iPhone with black case (Holland)." Defendant Bailey's counsel also raised a chain of custody objection to "the purple case phone of [Defendant] Bailey." The prosecutor stated that he intended to have other witnesses establish the chain of custody, and the trial court deferred ruling on the objections.

Detective Goble testified that, according to the chain of custody form[3] attached to a bag holding the victim's cell phone, crime scene unit Officer Joshua Clegg collected it and gave it to Detective Bruce Kilby, who in turn gave it to Detective Goble. Detective Goble stated that he signed it over to Detective Kolofsky.

Detective Goble identified a black iPhone with a purple case, which was labeled as belonging to Defendant Bailey ("Defendant Bailey's phone"). Detective Goble continued, "The first name on the chain of custody document is me." He noted that he obtained the phone from the war room and that he turned it over to Detective Kolofsky.[4] Detective Goble also turned over to Detective Kolofsky an iPhone with a black case that belonged to Defendant Holland ("Defendant Holland's phone").[5]

---

[3] The Circuit Court Clerk's office retained the cell phone exhibits; it did not scan or photograph the chain of custody forms that were apparently attached to the evidence bags.

[4] Detective Goble also identified an iPhone with a floral case as belonging to Defendant Bailey; Detective Kolofsky later testified that the phone was inoperable.

[5] Detective Goble also identified an iPhone "Model A1660" as the second phone collected from Defendant Holland; however, Detective Kolofsky later testified that the A1660 did not contain any accounts belonging to Defendant Holland.

On cross-examination, Detective Goble agreed that any detective at the S.O.U. office could have "badged in [or] badged out" of the war room. Detective Goble stated that, on the chain of custody form, he made a handwritten notation that "logged" Defendant Bailey's phone as having been obtained at 2:05 a.m. on December 9. Detective Goble said that, to his knowledge, one cell phone was obtained from Defendant Bailey's person and the other was obtained from her brother.

Detective Goble testified that he did not write a police report detailing his initial investigation because it was documented through his body camera and chain of custody documents. Detective Goble stated that the investigation to apprehend the other people who were in the Jeep that night was ongoing.

Relative to the neighbor's doorbell camera recording, Detective Goble did not recall what happened to his own cell phone recording of it. He stated that "a detective was going to come back out and . . . was supposed to obtain the actual video from the residence." Detective Goble acknowledged that the neighbor told him the video would only be retrievable for seven days; he stated that he relayed the deadline to Detective Brian Hughes and that Detective Hughes assigned the task to another detective.

CPD Detective Keenan Carlton testified that, on December 8, 2021, he went to Defendant Bailey's house twice. During the first visit, he spoke to Defendant Bailey's mother. Detective Carlton said that he later returned to the house "to recover a phone." Detective Carlton was asked, "And . . . did you receive the phone?" He answered affirmatively and noted that the phone had a purple case. Detective Carlton stated that he took it back to the police station, where "it likely would have been on the -- we have one large table." He said that the chain of custody form reflected that Detective Goble collected Defendant Bailey's phone at the S.O.U. office and "placed it into evidence."

On cross-examination, Detective Carlton agreed that he did not obtain the phone directly from Defendant Bailey. He testified that he tried to place Defendant Bailey's phone into airplane mode and that there were "things on her screen"; he denied going through her messages. Detective Carlton did not remember if he handed Defendant Bailey's phone to another person; he said that he did not start a chain of custody form.

Former CPD Detective Andrea Martin testified that she was with Detectives Carlton and Goble when they met Defendant Bailey at her home. On cross-examination, Detective Martin stated that she also met Defendant Bailey's mother and Defendant Bailey's two minor siblings. Detective Martin said that her interaction with Defendant Bailey's mother was limited to asking if Defendant Bailey was home. Detective Martin stated that she was instructed to "make contact" with Defendant Bailey and that she escorted Defendant Bailey into the street. Detective Martin said that, at some point later, she "went back and retrieved a phone[.]"

CPD Detective Kilby testified that he went to the Lincoln Homes scene and stayed in the area because there was an open field that had evidence to be collected. He noted that the Jeep was listed as stolen in the National Crime Information Center ("NCIC") database. Detective Kilby stated that Officer Clegg collected the victim's cell phone from the shooting scene and gave it to him; he, in turn, gave it to Detective Goble.

Detective Hughes testified that he responded to the scene of the shooting and spoke to Mr. Holler, the victim's family, and people who lived nearby. He noted that he was at the scene for no more than an hour after he was notified that a suspect was in custody. Detective Hughes stated that he obtained search warrants for Defendant Holland's and Defendant Bailey's phones. He also swabbed the Glock pistol for DNA.

Detective Hughes testified that, when Defendant Bailey was arrested, she had blonde hair and orange artificial fingernails, several of which were missing. Detective Hughes stated that the crime scene unit found an orange artificial fingernail in the front passenger floorboard of the Jeep.

On cross-examination, Detective Hughes testified that fourteen[6] .40 caliber cartridge casings and one 9 mm cartridge casing were found at the scene. He did not recall whether the 9 mm casing was sent to the Tennessee Bureau of Investigation ("TBI") for testing. Detective Hughes stated that no 9 mm firearm was recovered, although they found a 9 mm gun magazine in the Jeep.

After reviewing a search inventory document for the Jeep, Detective Hughes testified that sixteen of the thirty listed items were sent for testing. He agreed that lighters and "half smoked cigars" were not tested. Detective Hughes identified a gray backpack as one of the items found in the Jeep's backseat. Detective Hughes stated that the backpack contained school supplies, a water bottle, and "homework looking items"; the homework contained a name that did not belong to either Defendant. Detective Hughes testified that he called the Metropolitan Nashville Police Department and gave them the name shown on the homework, but no one by that name was in their system. Detective Hughes agreed that he did not have the water bottle or the backpack itself tested for DNA.

Relative to Defendant Bailey's phones, Detective Hughes testified that they did not send them for fingerprinting or DNA analysis. He noted that Defendant Bailey "had admitted to the possession [of] . . . the phones, at some point, in the investigation." Detective Hughes denied that Defendant Bailey had any signs of injury or bruising when he saw her.

---

[6] The rest of the record reflects that thirteen .40 caliber shell casings were found at the shooting scene.

Detective Hughes stated that he was advised that DNA testing or fingerprint testing could be performed on the Glock pistol, but not both. Detective Hughes said that, based upon the pistol's condition and the investigation, he decided that DNA testing might be more beneficial.

Detective Hughes testified that, while at the scene, he spoke to David Sworfsky, who was standing outside his home on a cul-de-sac in the neighborhood; Mr. Sworfsky told him that a white sedan had driven through the neighborhood twice at a high rate of speed. He agreed that he never "put out [the] white sedan over [his] radio," noting that MCSO had already pursued and stopped the Jeep. Detective Hughes agreed that the two other people from the Jeep were never apprehended. Detective Hughes stated that he did not have the Jeep swabbed for GSR.

On redirect examination, Detective Hughes testified that the Jeep was stolen, meaning that the backpack could have belonged to the owner's child or a third party. He stated that he ordered DNA testing of the pistol because it had multiple abrasive areas, meaning that a high probability of DNA transfer existed.

CPD Detective Jason Kurtich testified that he was the field commander for the crime scene unit and that he oversaw processing of the shooting scene; he later sent members of his team to process the Lincoln Homes scene but did not go there himself. He noted that he had team members manually create a diagram of the scene with measurements.

Detective Kurtich identified several crime scene photographs he took, which were received as exhibits. The photographs showed the victim on his back with his arms and legs splayed out; his head was near the middle-left side of the street, and his feet were facing the left curb. The victim's cell phone was on the left curb, along with one 9 mm cartridge casing. An intact projectile, which Detective Kurtich described as "almost . . . pristine," was found beneath the victim's jacket near his hip. Thirteen .40 caliber cartridge casings were scattered within a few feet of the victim.

Detective Kurtich explained that he generally tried to document and collect cell phones early in the process so that they could be turned over to detectives before the larger crime scene investigation was completed. The crime scene photographs reflect that the victim's cell phone was marked as "Item 1."

On cross-examination, Detective Kurtich testified that the crime scene unit deferred to the lead investigator's instructions on documenting and collecting evidence. Detective Kurtich noted, though, that he would sometimes make recommendations based upon his prior experience as a homicide detective.

- 12 -

Officer Clegg testified that, on December 8, 2021, Detective Kurtich sent him and Detective Green to process the Lincoln Homes scene. Officer Clegg testified that he found a loaded .40 caliber Glock pistol in a grassy area about twenty feet from the nearest road. The pistol had an unfired .40 caliber hollow-point round in the magazine and another in the chamber. Officer Clegg noted that the magazine held fifteen rounds. They did not find any other evidence in that area, but an officer recovered a gray knit cap at the complex's park, which was about "a couple . . . , three football fields away."

Officer Clegg testified that, at the shooting scene, he helped collect evidence; he noted that he did not seal evidence bags at the scene. Officer Clegg read from the victim's phone's chain of custody log, which noted that he collected the victim's phone at 12:31 a.m. on December 9 and transferred it to Detective Kilby at the same time. In addition to the ammunition found at the shooting scene, Officer Clegg also collected personal property from the victim, specifically, a small amount of suspected marijuana, a job application, a student schedule, a lighter, cigarillos, and $47 cash.

CPD Detective Timothy Green testified that he went with Officer Clegg to Lincoln Homes and photographed the Jeep, the knit hat, and the Glock pistol, which was in a grassy area between buildings. Detective Green identified a Google Maps satellite image of the Lincoln Homes area, which he marked with the approximate locations of the Jeep, the pistol, and the knit hat.

During a recess, Defendant Bailey moved to exclude Defendant Bailey's phone from evidence, arguing that the testimony did not establish the phone's "true owner," "anybody that had control over that phone[,]" or the name or address of the person from whom Detective Carlton received it. Defendant Bailey's counsel noted that Detective Carlton put the phone in the "war room," which "was frequented by anybody in S.O.U., possibly anybody from Evidence." Counsel stated that Detective Carlton did not note the time he initially collected the phone or when he left it in the war room.

Defendant Bailey's counsel argued that it was unknown who communicated with the phone, had control of it, or potentially manipulated it while it was in the war room before Detective Goble picked it up. Counsel noted that Detective Goble picked up the phone from the war room table and that nobody handed it off to him. Counsel averred that at least six detectives, a supervisor, and members of the crime scene unit were in and out of the war room that evening. Counsel stated that a link in the chain of custody was missing because another homicide detective possessed the phone during Defendant Bailey's police interview, but the only documentation was that Detective Goble picked up the phone from the war room and transferred it to Detective Kolofsky at 6:49 a.m.

- 13 -

The State responded that Detective Carlton had testified that he went to Defendant Bailey's house, was given her phone, and took it to the war room, where Detective Goble began the evidence log and turned over the phone to Detective Kolofsky.

The trial court found:

> Now, I will acknowledge that the war room is not like our typical evidence locker. But it is a restricted access area. There has been no testimony that would reflect that anyone other than the authorized law-enforcement personnel would be in the war room.
>
> Now, . . . we have already had cross-examination as to how the war room operates, in that there's other officers there. I think, that goes then to the weight that is to be given to this evidence.
>
> There, again, as it relates to the messages for which I anticipate [there will] be testimony by [Detective] Kolofsky, you need to think about cell phones and even more so text messages. It has to do with the weight.
>
> The mere fact that a message is sent from one cell phone to another, it's not established then the exact identity of the person that sent that message. For all we know, with messages that might be attributed to the victim, those messages could have just have easily come from a member of the Johnson family. They had the shared phone arrangement, so that goes to the weight.
>
> With that said, the motion to exclude testimony from [Detective] Kolofsky is denied.

Defendant Bailey's counsel then moved to exclude testimony regarding the contents of the victim's phone, arguing that two chains of custody had been established. Counsel stated that, according to Officer Clegg's testimony and follow-up report, he collected the victim's phone at 12:19 a.m. on December 9, and the phone remained with the victim's other personal property until it was turned in to Detective Barrett's evidence lockbox at 3:09 a.m. Counsel said that "we have some other chain of custody document that says" that Officer Clegg gave the phone to Detective Kilby. Counsel argued additionally that, although the victim's phone was listed as belonging to him on the chain of custody documents and the "request for the examination of the phone," the victim was a minor who was using his minor cousin's phone. Counsel averred that neither of them "could be the

- 14 -

legal owners of the phone" and that no evidence documented the consent of the legal owner to the search.[7]

The trial court denied the motion, noting that any messages on the phone after the victim's death would not be attributable to him. The court found,

> [T]he chain [of] custody is to protect the integrity of the evidence, and text messages are all time stamped, so as a practical matter, I don't see how there could be any contamination of the phone.

> Clearly, it was in . . . police custody from the time that it was collected. There is a gap in time, but I do not find that, that prevents the authentication of the phone.

Detective Kolofsky, an expert in mobile forensic examination, testified that she received the victim's cell phone from Detective Goble and extracted data from it. She noted that the "Apple I.D." belonged to the victim's male cousin but that she found "a phone number for an account and an Instagram that referenced Majors Arahmonie 402 Gmail."

Detective Kolofsky testified that, generally, an Instagram account had a username and a "vanity name," which could be changed. She stated that "there is a [identification] number that is associated with that account and that is stagnant and doesn't change." The victim's Instagram ID number was 16960319612; his username was "k7richro77in"; and the account name was "CERTIFIED STEPPA STR8WAY," with three emojis interspersed between the words.

Detective Kolofsky testified that Defendant Bailey's phone contained a Facebook account associated with an email address containing her middle and last names; Instagram and Snapchat accounts with the username "Barbiedollmir"; a second Snapchat account with the username "poppinassmir" and username "Barbiedollmir [symbol for female]"; and a second Instagram account with the username "freedagang2831." The phone number associated with Defendant Bailey's phone had a 931 area code and ended in 3118.

Detective Kolofsky testified that Defendant Holland's phone contained an "Apple I.D." email address containing his first and last name, as well as four Instagram accounts.

Detective Kolofsky testified that the victim's Instagram account showed a series or "thread" of twenty-seven messages exchanged with the account name "Mirr2shiesty."

---

[7] We note that the record does not contain a motion to suppress evidence obtained from the victim's cell phone.

When Detective Kolofsky extracted data from Defendant Bailey's phone, she found an Instagram account with ID number 10090132850 and account name "Barbiedollmir." The same ID number was associated with the "Mirr2shiesty" account that communicated with the victim. The phone number for the account had a 931 area code and ended in 3118.

Detective Kolofsky testified that some of the Instagram messages contained photos or video files that were not recoverable, although she could see timestamps for those messages. She noted that other messages were composed by typing text into a picture, then sending the picture. Detective Kolofsky stated that, by comparing data from the victim's and Defendant Bailey's phones, she was able to verify the messages sent by each of them.

Detective Kolofsky testified that she was able to access Instagram "cache folders" on both phones and that she was able to use images in the folders and message timestamps to reconstruct parts of the conversation between the victim and Defendant Bailey. She noted that the data report contained two timestamps: one was the "post-created" time and the other was the time at which the recipient viewed it. Combining the text messages and Instagram exchanges, the following conversation occurred:

| Time[8] | Sent by | Sent to | Message |
|---|---|---|---|
| 7:18 p.m. | Defendant Bailey | The victim | [Text message] Yoo |
| 7:18 p.m. | The victim | Defendant Bailey | [Text message] Yea |
| 7:26 p.m. | Defendant Bailey | The victim | Text me on here[9] cause sb got my password |
| 7:29 p.m. | The victim | Defendant Bailey | [Text message] U acting like u cnt txt bacc |
| 7:31 p.m. | The victim | Defendant Bailey | So txt u like dis[10] |
| 7:33 p.m. | Defendant Bailey | The victim | Otw ["on the way"] Uzend yo address people got my pw |
| 8:00 p.m. | The victim | Defendant Bailey | Wya rn ["where are you at right now"] |
| 8:01 p.m. | Defendant Bailey | The victim | What house you in ? |

[8] For consistency, we will use the timestamp reflecting when the recipient viewed the message.

[9] This was the first of Defendant Bailey's Instagram messages.

[10] This was the first of the victim's Instagram messages.

| 8:02 p.m. | The victim | Defendant Bailey | We at the store rn <br> Food lion |
|---|---|---|---|
| 8:03 p.m. | Defendant Bailey | The victim | Who you with ? Because I'm not with my bestie it's just me |
| 8:03 p.m. | The victim | Defendant Bailey | My cousin |
| 8:04 p.m. | Defendant Bailey | The victim | He finna be 3rd wheeling [laughing crying emojis] |
| 8:05 p.m. | The victim | Defendant Bailey | Naw u can jus come get me |
| 8:06 p.m. | Defendant Bailey | The victim | What's your house number |
| 8:19 p.m. | The victim | Defendant Bailey | wya |
| 8:19 p.m. | Defendant Bailey | The victim | I'm finna leave you taking to long |
| 8:20 p.m. | The victim | Defendant Bailey | Otw bac |
| 8:20 p.m. | The victim | Defendant Bailey | We coming rn |
| 8:21 p.m. | Defendant Bailey | The victim | Hurry up you know I'm by my self [laughing crying emoji] . . But it's just gone be me and you cause I don't want yo cousin 3 third wheeling |
| 8:22 p.m. | The victim | Defendant Bailey | Ight bet |
| 8:22 p.m. | The victim | Defendant Bailey | Ay [text message] |
| 8:23 p.m. | The victim | Defendant Bailey | Share yo loc ["location"] wit me |
| 8:24 p.m. | Defendant Bailey | The victim | I'm on the street you gave I'm Im on Buck Shot Street by the yellow school bus ion have no service |
| 8:24 p.m. | Defendant Bailey | The victim | I'm finna leave you taking to long |
| 8:27 p.m. | The victim | Defendant Bailey | Ima by the store rn |

| Not specified[11] | The victim | Defendant Bailey | See Ong otw [the background photo is a car stereo] |
|---|---|---|---|
| 8:27 p.m. | Defendant Bailey | The victim | Who driving [laughing crying emoji] |
| 8:27 p.m. | The victim | Defendant Bailey | My cousin sister |
| 8:30 p.m. | The victim | Defendant Bailey | [A screenshot of a satellite view of the victim's neighborhood showing Whitetail Drive and Buckshot Drive] |
| 8:30 p.m. | The victim | Defendant Bailey | [Another screenshot of the map of the victim's neighborhood; the victim's house is marked] |
| 8:31 p.m. | Defendant Bailey | The victim | What? |
| 8:31-33 p.m. | Defendant Bailey | The victim | *Video chat* |
| 8:34 p.m. | The victim | Defendant Bailey | [A dark blurry image, which appears to have been a short video; the thumbnail shows a blurry street sign reading "Dolphin Ln"] |
| 8:34 p.m. | The victim | Defendant Bailey | Come dere [Photograph is a blurry doorway floor] |
| 8:34 p.m. | The victim | Defendant Bailey | Cuz I seen the bus tho |
| 8:35 p.m. | Defendant Bailey | The victim | Boy just walk to Buckshot Street by the bus |
| 8:36 p.m. | The victim | Defendant Bailey | Ight |
| 8:36 p.m. | The victim | Defendant Bailey | Take a pic wea u at so I can see |
| 8:36 p.m. | Defendant Bailey | The victim | By the bus ! |
| 8:38 p.m. | Defendant Bailey | The victim | wya v |
| 8:38 p.m. | The victim | Defendant Bailey | [an indiscernible image from a three-second video clip; although the copy of the video in the record does not play, the |

[11] Detective Kolofsky stated that the message did not have a timestamp "because it hadn't gotten there yet to be viewed."

- 18 -

| | | | record reflects that the clip showed Mr. Holler's house, which was decorated with Christmas lights.] |
|---|---|---|---|
| 8:39 p.m. | The victim | Defendant Bailey | *Video chat* |
| 8:39 p.m. | Defendant Bailey | The victim | Walk up |
| 8:40 p.m. | The victim | Defendant Bailey | *Video chat* |

Detective Kolofsky testified that, at 7:59 p.m., Defendant Bailey's phone had a search in Apple Maps for "Buckshot Drive." At 11:07 p.m., she searched for an address on Jim Thorpe Drive, which was the street on which she lived.

CPD Detective Nathan Lee testified that he took GSR swabs from Defendant Bailey's hands and "around the face." He stated that he also took GSR swabs from Defendant Holland's hands, face, "around his ears[,] and around his nose." He stated that he did not seal the envelopes and placed them on the table in the war room.

Before the medical examiner's testimony, Defendant Holland's counsel objected to the entry of fifteen proposed autopsy photographs, arguing that neither Defendant had disputed the victim's cause of death or his injuries and that the probative value of the photographs was significantly outweighed by their prejudicial effect. Defendant Holland's counsel noted that, although the State had "done what they could" to minimize the gory nature of the wounds, the only reason to admit the photographs would be to inflame the passions of the jury. Defendant Holland's counsel stated that the medical examiner's anatomical diagram of the victim's wounds in the autopsy report would assist the jury in "a much less prejudicial manner" than the photographs.

The content of the proposed photographs was not described for the record, and the fifteen photographs were not exhibited to the jury-out hearing. However, fifteen photographs were ultimately introduced during the medical examiner's testimony; six of the photographs showed the projectiles recovered from the victim's body and clothing; one was an x-ray of the victim's upper body, showing several projectiles still inside it; and six were color photographs of the victim's injuries. Later testimony established that the victim's wounds had been washed by the medical examiner, and no dried blood was visible. The photographs of the victim's injuries were as follows:

(1) a close view of the victim's face, showing a hole surrounded by a pale oblong circle of tissue to the left of his nose (Gunshot 1);

(2) a close angle of the back of the victim's neck and scalp, showing several red holes and tears in the skin in a line (Gunshot 2);

(3) the victim's left shoulder, showing a small red hole (Gunshot 8);

(4) the victim's left forearm, hand, and torso, showing several small red holes (Gunshots 3, 4, 5, 10, and 13);

(5) a wide angle of the victim's back, showing several small red holes (Gunshots 6, 7, 9, 11, and 14); and

(6) the victim's hand with a small red hole in the middle finger (Gunshot 12)

The State responded that the photographs of the gunshot wounds were probative of premeditation. The State averred that it had endeavored to minimize the number of photographs introduced and that the photographs were not gruesome.

The trial court found that the probative value relevant to premeditation was not outweighed by the photographs' prejudicial effect, noting that they did not show blood and that the case involved fourteen gunshots. The trial court admitted the photographs.

Nashville Assistant Medical Examiner Dr. Gulpreet Bowman, an expert in forensic pathology, testified that she performed the victim's autopsy and recovered five projectiles from his body; three additional projectiles were found in the victim's clothing. Dr. Bowman described the victim's fourteen gunshot wounds as follows:

Gunshot 1 entered the face on the "right aspect of the nasal bridge" and exited the back left side of the head. The autopsy report stated that it fractured the right maxilla and traveled into the cranial cavity, perforated the right and left frontal lobe and the left parietal lobe of the brain, and fractured the "right and left anterior cranial fossa" and left parietal and temporal bones. Gunshot 2 entered the skin at the back of the head and neck; the projectile exited and reentered the scalp several times but did not enter the cranial cavity.

Gunshot 3 entered the left lateral chest and injured the ribs, diaphragm, liver, and both lungs before exiting the right upper chest. Gunshot 4 entered the left lateral chest and did not injure any "critical structures." Gunshot 5 entered the left lateral chest, injuring the left ribs, diaphragm, liver, stomach, spleen, intestines, left lung, and thoracic vertebrae before exiting the mid-back.

Gunshot 6 entered the left upper back, fracturing a rib and injuring the left lung, aorta, esophagus, and "bilateral brainstem bronchi." Gunshot 7 entered the left lower back; the autopsy report stated that it perforated "multiple loops of bowel" and the liver before

fracturing a rib and exiting at the right ribcage. Gunshot 8 entered the left shoulder and injured the humerus, shoulder bone, and scapula.

Gunshot 9 entered and exited the left upper arm. Gunshot 10 was a "perforating wound" to the left wrist that fractured the wrist bones. Gunshot 11 entered and exited the right wrist. Gunshot 12 entered and exited the right middle finger, fracturing the bone. Gunshot 13 entered the "left inguinal region," injuring the bladder, right femur head, and pelvis. Gunshot 14 entered at the left buttock and grazed the bladder.

Dr. Bowman noted that none of the wounds had soot deposits or stippling, meaning that the gun was fired from at least several feet away. When asked which wounds were "more critical than others," Dr. Bowman discussed Gunshots 1, 3, 5, 6, 7, 13, and 14. Dr. Bowman determined that the cause of death was multiple gunshot wounds, and the manner of death was homicide.

During a recess, Defendant Holland's counsel asked to note for the record that, in response to seeing the autopsy photographs, two of the victim's family members "ran out . . . in tears and people ran after them." Defendant Holland's counsel argued that, although it was difficult to show prejudicial effect, "we did observe some very intense reactions in the courtroom."

In response, the trial court stated that homicide cases were "terribly emotional" for family members; that Defendants were charged with first degree premeditated murder; and that "[w]e can't change the fact of the number of rounds that struck the victim in this case." The trial court noted that "these photographs were not as gruesome as many times [autopsy photographs] are."

CPD Detective Cody Heath testified that he collected evidence from the Jeep at the police impound bay. He swabbed fifteen locations on the Jeep for DNA and collected a loaded black 9 mm firearm magazine from the middle of the backseat, a "loose" 9 mm round from the back floorboard underneath the driver's seat, and an orange artificial fingernail from the front passenger's side floorboard. Detective Heath stated that he was not asked to swab the fingernail for DNA.

TBI Special Agent Charly Castelbuono, an expert in forensic biology, testified that she compared DNA swabs from the Jeep, the knit cap found at Lincoln Homes, a key fob, and "Item 46," which the parties stipulated was the Glock pistol recovered at Lincoln Homes, with DNA standards from Defendants Holland and Bailey.

Agent Castelbuono's findings relative to the Jeep reflected that the front passenger interior door handle contained Defendant Bailey's DNA. Other DNA profiles were found in several other locations, but they were too small for comparison.

- 21 -

Agent Castelbuono testified that, relative to the swab that matched Defendant Bailey, the probability of selecting an unrelated individual with the same DNA profile was "one in a number greater than the current world population for the African-American, Caucasian, and Southwestern Hispanic populations."

Agent Castelbuono testified that she did not test the ski mask collected from Defendant Holland because she would expect his DNA to be present if he had been wearing it. She stated that the Jeep's key fob contained four DNA profiles, including one male. Agent Castelbuono said that the knit cap from Lincoln Homes contained three DNA profiles, at least one of which was male. Agent Castelbuono testified that swabs from the Glock pistol contained two DNA profiles, at least one of which was male. All of these were inconclusive for comparison purposes.

Agent Castelbuono testified that she also tested swabs from the 9mm magazine found in the backseat of the Jeep. The magazine contained a mixture of at least four DNA profiles, at least one of which was male. The major contributor was "an unknown male," and Defendant Holland was excluded as the major contributor. The minor contributors' profiles were inconclusive for comparison purposes.

On cross-examination, Agent Castelbuono stated that, if Defendant Holland's mask had not been labeled as belonging to him, she would have tested it so long as it was relevant to the investigation. She stated that she did not identify Defendant Holland's DNA on any of the items, but she noted that she could not say with certainty that his DNA was not present on them. Agent Castelbuono agreed that she could not determine when DNA was deposited on an item.

TBI Special Agent Lindsey Anderson, an expert in GSR analysis, testified that she "did the technical review" of the GSR report in this case. She stated that the analyst who tested the GSR swabs in this case and wrote the report, Agent Russ Davis, was recovering from surgery and was unavailable to testify. Agent Anderson stated that, in all her unit's cases, reports were passed to a technical reviewer "to ensure that there are two scientists who agreed on these conclusions" and that she agreed with Agent Davis's findings.

Agent Davis's November 30, 2022 report reflected that Defendant Holland's swabs were positive for GSR and that Defendant Bailey's swabs were negative for GSR. Agent Anderson testified that the presence of GSR was consistent with a person's having discharged a firearm, having been near a firearm when it was discharged, having handled a recently discharged firearm, or having touched something with GSR on it. She noted that GSR could be "lost over time" due to activity or washing one's hands and that a negative GSR test did not eliminate the possibility that a person was "associated with a firearm." Agent Anderson said that TBI policy was not to test GSR swabs from the victims of

gunshot wounds and that "there is no case in which [she] would say that the testing of [GSR] from a victim would . . . provide useful information."

Agent Anderson testified that Agent Davis later tested the knit cap from Lincoln Homes for GSR. Agent Anderson agreed that she used "the bench notes in order to review" the second report. She stated that Agent Davis identified one particle with all three elements of GSR, as well as a second particle that had two of the three elements. Agent Anderson noted that, in addition to firearms, the two-element particle could be consistent with brake pads, fireworks, "cartridge-operated tools," and airbags.

During a recess, Defendant Holland's counsel addressed the trial court as follows:

[DEFENDANT HOLLAND'S COUNSEL]: So I was informed that they were going to have a "pinch-hitter." I was not informed that she was strictly going to be testifying from the notes made by somebody else, Your Honor . . . . I was not provided any of the case notes right here or the one that's already been entered.

I thought all that was being entered was . . . the report. I didn't realize that there are -- and so, I mean, I . . . would move to strike the testimony, Your Honor, as evidence that was not provided to us at all.

[THE STATE]: Well, if we could question the Agent here if she was doing it off memory. I don't know that she was looking through [the notes].

I did not provide her that until after the testimony of her -- of each report. But that is, I believe, what you would call the "work product" of the Agent's and she would have reviewed it to begin with, that's correct.

But . . . Agent Anderson could testify as -- if she knew these from the report. I mean, she could read those. I mean, . . . that's all we have to do. We can just have her read them.

Defendant Bailey's counsel stated that she also had not been provided the bench notes in discovery. Defendant Holland's counsel noted that Detective Lee had testified that he took separate GSR swabs from Defendant Holland's hands, face, and ears, but the GSR report did not indicate which of the three swabs tested positive. Agent Anderson interjected that the analysts "never specify" which of the swabs tested positive.

The trial court found that the report was admissible but excluded the bench notes because they were not disclosed in discovery. The court noted for the record that the bench notes had not been published to the jury.

- 23 -

TBI Special Agent Denver Hall, an expert in firearms and toolmark examination, testified that he test fired the Glock pistol from Lincoln Homes and determined that the Glock pistol fired all thirteen .40 caliber cartridge casings and the projectile from the shooting scene; the five projectiles recovered from the victim's body; and the three projectiles recovered from the victim's clothing.

Regional Organized Crime Information Center analyst Stephanie Herzer, an expert in criminal intelligence analysis, testified that Detective Kolofsky requested her assistance to map the device location data from Defendant Holland's phone. She stated that, when a cell phone "registered" a location, it gave a "precision rating" that corresponded to a phone's distance from a certain latitude and longitude. Ms. Herzer said that, in this case, the precision ratings "were all less than 100 meters for the majority of the points." Ms. Herzer used a computer program to map the phone's locations.

Ms. Herzer testified that, between 6:17 p.m. and 6:37 p.m. on December 8, 2021, Defendant Holland's phone was at twenty-four locations on the northeast side of downtown Clarksville. Ms. Herzer stated that no location data existed between 6:37 p.m. and 8:31 p.m. She noted that, generally, this indicated that the phone could have been powered off or had its location data turned off. At 8:31 p.m., the phone reappeared at nine locations in the Deer Trail subdivision. Ms. Herzer stated that all the locations were within about 200 feet of the shooting scene. At 8:41 p.m., the phone moved out of the neighborhood, and the phone progressively moved several miles west to Madison Street. The last location was logged at 8:50 p.m.

On cross-examination, Ms. Hertzer acknowledged that she did not know who possessed the cell phone that evening. Ms. Herzer clarified that she used GPS data, not cell tower data, in her analysis.

The State rested. During the jury charge conference, the trial court noted that it intended to issue a flight instruction. Defendant Holland's counsel requested three supplemental instructions: (1) an instruction on the State's duty to preserve evidence relative to the neighbor's doorbell camera recording, which the trial court granted; (2) an instruction regarding the absence of a material witness, the Jeep's owner, which the trial court denied; and (3) an instruction on conspiracy to commit facilitation of first degree murder as a lesser-included offense in Count 1, which the trial court denied. The trial court asked if the parties had any other requests, and Defendants Holland and Bailey responded negatively.

However, before closing arguments, Defendant Holland's counsel raised an objection to the flight instruction. Defendant Holland's counsel noted that "several unpublished opinions" from this court stated that charging flight in a case involving an evading arrest charge "can be err[or.]" Defendant Holland's counsel added that he did not

believe sufficient testimony had been presented to establish a leaving of the scene and "subsequent hiding out, evasion or concealment in the community[.]" The State responded that Defendant Holland's evading arrest after officers attempted to stop the Jeep was separate from the flight occurring after the murder. The trial court agreed with the State.

Defendants chose not to present proof. During closing arguments, the State acknowledged that it had presented no proof regarding the Jeep's value; the prosecutor argued that Defendants were instead guilty of the lesser-included offense of joyriding.

After the jury retired to deliberate, Defendant Holland's counsel stated for the record that, although counsel had reviewed the draft jury instructions, counsel had "overlooked" that an identity instruction was missing. Counsel argued that identity "is a question and required as a result of arguments made by [Defendant Bailey's counsel] primarily." Defendant Bailey's counsel stated for the record that she agreed.

Upon this evidence, the jury convicted Defendant Bailey of first degree premeditated murder in Count 1; the lesser-included offense of evading arrest in an automobile in Count 2; and the lesser-included offense of joyriding in Count 3. The jury convicted Defendant Holland of first degree premeditated murder in Count 1; evading arrest while operating a motor vehicle and creating the risk of death or injury to another in Count 2; the lesser-included offense of joyriding in Count 3; and evading arrest in Count 4. Both Defendants received an effective life sentence.

Defendants Bailey and Holland filed timely motions for new trial, which the trial court denied after a hearing. Defendants timely appealed.

## II. Analysis

We will address Defendants' consolidated issues as follows: (1) sufficiency of the evidence (Holland issue #1 and Bailey issue #5); (2) evidentiary issues (Bailey issues #1-4, Holland issue #4); (3) the admission of Agent Anderson's testimony about Agent Davis's GSR report (Holland issue #3); and (4) the lack of a jury instruction on identity and the inclusion of an instruction on flight (Bailey issues #6 and 7, Holland issue #2).

### A.    Sufficiency of the Evidence

Our standard of review for a sufficiency of the evidence challenge is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979) (emphasis in original); *see also* Tenn. R. App. P. 13(e). Questions of fact, the credibility of witnesses, and weight of the evidence are resolved by the fact finder. *State v. Bland*, 958 S.W.2d 651, 659 (Tenn. 1997). This

court will not reweigh the evidence. *Id.* Our standard of review "is the same whether the conviction is based upon direct or circumstantial evidence." *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011) (quoting *State v. Hanson*, 279 S.W.3d 265, 275 (Tenn. 2009)) (internal quotation marks omitted).

A guilty verdict removes the presumption of innocence, replacing it with a presumption of guilt. *Bland*, 958 S.W.2d at 659; *State v. Tuggle*, 639 S.W.2d 913, 914 (Tenn. 1982). The defendant bears the burden of proving why the evidence was insufficient to support the conviction. *Bland*, 958 S.W.2d at 659; *Tuggle*, 639 S.W.2d at 914. On appeal, the "State must be afforded the strongest legitimate view of the evidence and all reasonable inferences that may be drawn therefrom." *State v. Vasques*, 221 S.W.3d 514, 521 (Tenn. 2007).

### 1. *First degree murder*

Defendant Holland contends that the evidence is insufficient to support his first degree premeditated murder conviction, arguing that premeditation and his identity were not sufficiently proven. Defendant Holland notes that, although the State confined its argument regarding criminal responsibility to Defendant Bailey, he would also argue that insufficient evidence was presented to prove that he was criminally responsible for the murder. The State responds that the evidence is sufficient.

Premeditated first degree murder is, as charged in this case, "[a] premeditated and intentional killing of another[.]" Tenn. Code Ann. § 39-13-202(a)(1). A person acts intentionally "when it is the person's conscious objective or desire to engage in the conduct or cause the result." Tenn. Code Ann. § 39-11-302(a). Premeditation "is an act done after the exercise of reflection and judgment." Tenn. Code Ann. § 39-13-202(e). "'Premeditation' means that the intent to kill must have been formed prior to the act itself. It is not necessary that the purpose to kill pre-exist in the mind of the accused for any definite period of time." *Id.* Additionally, "[t]he mental state of the accused at the time the accused allegedly decided to kill must be carefully considered in order to determine whether the accused was sufficiently free from excitement and passion as to be capable of premeditation." *Id.*

"Because premeditation involves the defendant's state of mind, of which there is often no direct evidence, we have long recognized that premeditation may be proved by circumstantial evidence . . . and may be inferred from the manner and circumstances of the killing[.]" *State v. Reynolds*, 635 S.W.3d 893, 916 (Tenn. 2021) (internal citations and quotation marks omitted). Whether premeditation is present in a given case is a question of fact to be determined by the jury from all the circumstances surrounding the killing. *State v. Davidson*, 121 S.W.3d 600, 615 (Tenn. 2003) (citing *State v. Suttles*, 30 S.W.3d 252, 261 (Tenn. 2000); *State v. Pike*, 978 S.W.2d 904, 914 (Tenn. 1998)).

Our supreme court has discussed that "numerous specific circumstances . . . may bear on the existence of premeditation," including,

(1) The use of a deadly weapon on an unarmed victim;

(2) The particular cruelty of the killing;

(3) Threats or declarations of intent to kill;

(4) The procurement of a weapon;

(5) Any preparations to conceal the crime undertaken before the crime was committed;

(6) The destruction or secretion of evidence of the killing;

(7) Calmness after the killing;

(8) Evidence of motive;

(9) The use of multiple weapons in succession;

(10) The infliction of multiple wounds or repeated blows;

(11) Evidence that the victim was retreating or attempting to escape when killed;

(12) The lack of provocation on the part of the victim; and

(13) The failure to render aid to the victim.

*Reynolds*, 635 S.W.3d at 916-17 (citations omitted). However, this "list of specific circumstances developed through Tennessee caselaw is not exhaustive," and the trier of fact "is not limited to any specific evidence when determining whether a defendant intentionally killed the victim after the exercise of reflection and judgment." *Id.* at 917 (citing *State v. Leach*, 148 S.W.3d 42, 54 (Tenn. 2004)); *see Davidson*, 121 S.W.3d at 615; Tenn. Code Ann. § 39-13-202(e). "Ultimately, then, premeditation may be established by any evidence from which a rational trier of fact may infer that the killing was done after the exercise of reflection and judgment." *Reynolds*, 635 S.W.3d at 917 (internal citations and quotation marks omitted).

The identity of the perpetrator is "an essential element of any crime." *State v. Rice*, 184 S.W.3d 646, 662 (Tenn. 2006), *abrogated on other grounds by State v. Miller*, 638 S.W.3d 136 (Tenn. 2021). Identity may be established with circumstantial evidence alone, and the "jury decides the weight to be given to circumstantial evidence, and [t]he inferences to be drawn from such evidence . . . ." *Id*. (internal quotation marks omitted). The question of identity is a question of fact left to the trier of fact to resolve. *State v. Crawford*, 635 S.W.2d 704, 705 (Tenn. Crim. App. 1982).

In the light most favorable to the State, the evidence was sufficient for a rational jury to find that Defendant Holland killed the victim with premeditation. Jalaysia testified that, shortly before the victim was shot, the victim was video chatting with a girl and went outside. Defendant Bailey's and the victim's cell phone records reflected that she told the victim that she was in his neighborhood alone and that she asked him to meet her without a "third wheel." Defendant Bailey's DNA and the artificial fingernail in the Jeep, as well as Mr. Leslie's testimony that he saw a person with blonde hair, indicated that she was in the front passenger seat.

After hearing multiple shots, Mr. Holler exited his home and saw the Jeep quickly driving away. Defendant Holland's cell phone location data placed him within 200 feet of where the victim was killed, and it tracked his flight from the area after the shooting to the location where the police first encountered the Jeep. Defendant Holland fled from police before stopping the Jeep at Lincoln Homes and fleeing on foot. The surveillance recording showed that Defendant Holland was the only one of the Jeep's four occupants who ran through the center of the grassy area in which Officer Clegg found the Glock pistol. The pistol's magazine held fifteen rounds; thirteen cartridge casings were found at the crime scene, and the pistol contained one round in the magazine and one in the chamber. Defendant Holland tested positive for GSR. Agent Hall identified the Glock pistol as having fired all the cartridge casings at the scene and the projectiles in and around the victim's body. Dr. Bowman testified that the victim had fourteen gunshot wounds.

Defendant Holland's argument related to identity is based upon the weight of the evidence rather than its sufficiency— he notes that the evidence of his identity was circumstantial; that no DNA evidence linked him to the shooting; that the location data only established that he was "near where [the victim] was shot and that he traveled some distance with the actual shooter"; and that there was no proof that the GSR on his person was acquired by handling or firing the Glock pistol. However, as we have stated, identity may be established by circumstantial evidence alone; by its verdict, the jury found that Defendant Holland was the person who shot the victim, and we will not disturb its determination. *See Rice*, 184 S.W.3d at 662; *Crawford*, 635 S.W.2d at 705.

Relative to premeditation, a rational jury could find that the shooting was premeditated based upon the use of a deadly weapon on an unarmed victim; the

- 28 -

procurement of a weapon; Defendant Holland's wearing a ski mask, which could be interpreted as preparation for the crime; the fourteen gunshot wounds inflicted on the victim, thirteen of which came from the same Glock pistol; the fact that some of the gunshot wounds entered on the victim's back, from which a juror could reasonably infer that he was attempting to retreat or escape; a lack of provocation on the part of the victim; Defendant Bailey's messages falsely stating that she was alone and wanted to meet the victim without a "third wheel," essentially luring the victim into an ambush; and Defendant Holland's failure to render aid to the victim. Defendant Holland is not entitled to relief on this basis.[12]

## 2. *Joyriding*

As a preliminary matter, Defendant Bailey frames this issue in her brief as whether the trial court erred by finding that the victim named in the indictment "was not a material witness to the charge of Theft of Property." Defendant Bailey's brief cites *State v. Ostein*, 293 S.W.3d 519, 534 (Tenn. 2009), for the proposition that "[m]ateriality of a witness is determined by whether their testimony could potentially influence the judgment of the court or jury regarding the facts of the case." Defendant Bailey's brief also cites *State v. Hannah*, No. M2012-00842-CCA-R3-CD, 2014 WL 117400, at *13 (Tenn. Crim. App. Jan. 14, 2014), for the proposition that, "[t]o be considered a material witness, the witness must be able to provide evidence that could affect the outcome of the trial." *Ostein* involved a trial court's compelling the State to disclose the identity of a confidential informant, and *Hannah* involved a defendant's constitutional right to compulsory process for obtaining a material witness. Neither case relates to Defendant Bailey's discussion of the issue.

Defendant Bailey's brief claims that the State "did not provide testimony from the alleged true owner of the vehicle and did not produce evidence that the car was taken without the effective consent of the owner." Defendant Bailey notes the trial court stated that it did not think "the identity of the owner is necessarily an element of the offense." Defendant Bailey asserts that the owner's testimony "was necessary to prove theft of the vehicle." We agree with the State that Defendant Bailey's issue is properly understood as a challenge to the sufficiency of the evidence.

Although Defendant Bailey was charged with theft of property over $10,000, the State conceded in its closing argument that it had provided no proof as to the Jeep's value and asked the jury to convict both Defendants of the lesser-included offense of joyriding. Joyriding, as relevant to this case, occurs when a person "takes another's automobile . . .

---

[12] Given that we have concluded that the evidence of Defendant Holland's identity as the shooter was sufficient, we need not address his criminal responsibility argument.

without the consent of the owner and the person does not have the intent to deprive the owner thereof." Tenn. Code Ann. § 39-14-106.

In the light most favorable to the State, Detective Kilby testified that the Jeep had been reported as stolen in the NCIC database. Mr. Leslie saw a person with blonde hair in the Jeep's passenger seat, and an orange artificial fingernail was found in the front passenger floorboard. Detective Hughes testified that, at the time of her arrest, Defendant Bailey had blonde hair and was wearing orange artificial fingernails, some of which were missing. Additionally, Defendant Bailey's DNA was found on the front passenger interior door handle. The evidence was sufficient for a rational jury to find that Defendant Bailey was inside the Jeep, which was taken without the consent of the owner who had reported it as stolen and that she was, at minimum, criminally responsible for the taking. She is not entitled to relief.

### B. Evidentiary Issues

When a trial court makes an evidentiary ruling, the appropriate standard of review on direct appeal is "whether the record clearly demonstrates that the trial court abused its discretion in ruling the evidence inadmissible." *State v. McCaleb*, 582 S.W.3d 179, 186 (Tenn. 2019) (citing *Regions Bank v. Thomas*, 532 S.W.3d 330, 336 (Tenn. 2017); *State v. Davis*, 466 S.W.3d 49, 61 (Tenn. 2015)). In *McCaleb*, our supreme court explained:

> We emphasize that the abuse of discretion standard of review does not permit an appellate court to substitute its judgment for that of the trial court. *State v. Harbison*, 539 S.W.3d 149, 159 (Tenn. 2018). Rather, "[b]ecause, by their very nature, discretionary decisions involve a choice among acceptable alternatives, reviewing courts will not second-guess a trial court's exercise of its discretion simply because the trial court chose an alternative that the appellate courts would not have chosen." *White v. Vanderbilt Univ.*, 21 S.W.3d 215, 223 (Tenn. Ct. App. 1999). Accordingly, if the reviewing court determines that "reasonable minds can disagree with the propriety of the decision," the decision should be affirmed. *Harbison*, 539 S.W.3d at 159.

*Id.*

### 1. Chain of custody

Defendant Bailey contends that the chain of custody of her cell phone and the victim's cell phone was not sufficiently established. The State responds that the trial court correctly admitted the cell phone evidence.

Tennessee Rule of Evidence 901(a) provides that "[t]he requirement of authentication or identification as a condition precedent to admissibility is satisfied by evidence sufficient to the court to support a finding by the trier of fact that the matter in question is what its proponent claims." Tenn. R. Evid. 901(a). The Tennessee Supreme Court has previously recognized that it is "well-established that as a condition precedent to the introduction of tangible evidence, a witness must be able to identify the evidence or establish an unbroken chain of custody." *State v. Scott*, 33 S.W.3d 746, 760 (Tenn. 2000) (internal quotes omitted).

The purpose of the chain of custody requirement is "to demonstrate that there has been no tampering, loss, substitution, or mistake with respect to the evidence." *Id.* (quoting *State v. Braden*, 867 S.W.2d 750, 759 (Tenn. Crim. App. 1993)). Even though each link in the chain of custody should be sufficiently established, Rule 901(a) does not require that the identity of tangible evidence be proven beyond all possibility of doubt, nor is the State required to establish facts which exclude every possibility of tampering. *State v. Cannon*, 254 S.W.3d 287, 296 (Tenn. 2008) (citing *Scott*, 33 S.W.3d at 760). "[W]hen the facts and circumstances that surround tangible evidence reasonably establish the identity and integrity of the evidence, the trial court should admit the item into evidence." *Id.* In addition, the State's failure to call as a witness each person who handled an item does not necessarily preclude the admission of the evidence. *Id.* Absent sufficient proof of the chain of custody, however, the "evidence should not be admitted . . . unless both identity and integrity can be demonstrated by other appropriate means." *Scott*, 33 S.W.3d at 760 (quoting Cohen et al., *Tennessee Law of Evidence* § 901.12, at 624 (3d ed. 1995)).

We review challenges to the chain of custody of evidence under the abuse of discretion standard. *Cannon*, 254 S.W.3d at 295 (citing *Scott*, 33 S.W.3d at 752). Generally, "[a] trial court abuses its discretion when it applies incorrect legal standards, reaches an illogical conclusion, bases its ruling on a clearly erroneous assessment of the proof, or applies reasoning that causes an injustice to the complaining party." *State v. Phelps*, 329 S.W.3d 436, 443 (Tenn. 2010).

### i. Defendant Bailey's phone

Relevant to Defendant Bailey's phone, she argues that Detective Carlton did not obtain a "a property document signed from anyone who was the true owner or anyone that had control over that phone"; that Detective Carlton did not recall whether he handed the phone off to another person; and that Detective Carlton did not initiate a chain of custody form or "submit a follow-up report regarding his retrieval of the cell phone." Defendant Bailey submits that the war room was accessible "throughout the evening" by members of the homicide and crime scene units and that Detective Goble handed off the phone to Detective Kolofsky four hours later. The State responds that the testimony reasonably

established the identity and integrity of the evidence and that the trial court properly admitted it.

We conclude that the trial court did not abuse its discretion by finding that the chain of custody for Defendant Bailey's phone was sufficient. Detective Carlton testified that he went to Defendant Bailey's home and that someone there provided him with her phone. Detective Goble testified that, to his knowledge, one cell phone was obtained from Defendant Bailey's person. Detective Hughes testified that Defendant Bailey had "admitted to the possession of" her phone. Detective Carlton stated that he transported it to the S.O.U. office's war room and placed it on the large table. Sergeant Newman testified that the war room was "[s]ecure to us," and Detective Goble agreed that detectives had to "badge[] in" to the war room, suggesting that the room was locked. Detective Goble testified that he picked up Defendant Bailey's cell phone from the war room table, which he stated corresponded to the first entry on the written chain of custody form, and that he took it to Detective Kolofsky for analysis. As the trial court found, the relevant messages were timestamped, meaning that the possibility of manipulation was low; we note that many of the communications were corroborated by their presence on both Defendant Bailey's and the victim's phones.

Defendant Bailey further submits that a gap in the chain of custody exists "in the transcript [because] . . . the phone was in the possession of and controlled by another homicide detective in the interview room with [Defendant] Bailey." Defendant Bailey does not acknowledge that this fact is not documented in any part of the record aside from the statements of counsel, which are insufficient to enable our review. We emphasize that an offer of proof should be made in such circumstances. *See, e.g., State v. Hall*, 958 S.W.2d 679, 691 n.10 (Tenn. 1997) (noting that our supreme court has "repeatedly stressed the importance of an offer of proof" because it ensures "effective and meaningful appellate review . . . [and] provides the trial court with the necessary information before an evidentiary ruling is made. Indeed, generally, if an offer of proof is not made, the issue is deemed waived and appellate review is precluded"). To the extent that a gap in the chain of custody may have existed because the phone was in the possession of and controlled by another homicide detective in the interview room with Defendant Bailey, Defendant Bailey has waived our consideration of it for failure to make an adequate record. *See* Tenn. R. App. P. 36(a) (stating, "Nothing in this rule shall be construed as requiring relief be granted to a party responsible for an error or who failed to take whatever action was reasonably available to prevent or nullify the harmful effect of an error").

The record supports the trial court's finding that the State had "reasonably establish[ed] the identity and integrity of the evidence[.]" *Cannon*, 254 S.W.3d at 296. Defendant Bailey is not entitled to relief on this basis.

*ii. The victim's phone*

Defendant Bailey argues relative to the victim's phone that the chain of custody was insufficient because "[d]espite being listed as the owner of the phone on several documents that were provided throughout discovery [the victim] was not the owner of the phone." She also asserts that Officer Clegg's testimony and one of the chain of custody forms established that it was signed over to Detective Kilby with the victim's other personal property, but "another chain of custody [form] identifies the phone as Item Number 1 and does not follow the same chain as the one that includes the phone with other listed property." She states that Officer Clegg's follow-up report states that "he submitted the items into evidence" and that the conflicting forms "create confusion and ambiguity regarding the identity and integrity" of the victim's phone.

The State responds that the evidence did not conflict, that the testimony reasonably established the identity and integrity of the phone, and that the trial court properly admitted it.

As a preliminary matter, Defendant Bailey did not raise a chain of custody issue related to the victim's phone in her motion for new trial.[13] Although Defendant Bailey's counsel stated briefly at the motion for new trial hearing that the chains of custody "on all the cell phones are off," the record does not contain a written amendment reducing an issue with the victim's phone to writing. Although trial courts are instructed to liberally allow amendments to a motion for new trial, "[w]hen an issue is raised orally in a motion for a new trial but is not subsequently reduced to writing, it is waived." *State v. Maxwell*, No. M2024-00786-CCA-R3-CD, 2026 WL 592500, at *7 (Tenn. Crim. App. Mar. 3, 2026), *perm. app. not yet filed*; *see* Tenn. R. Crim. P. 33(b) (stating that a motion for a new trial "shall be in writing" and that the trial court "shall liberally grant motions to amend the motion for new trial until the day of the hearing"); *see also State v. Faxon*, No. E2023-01480-CCA-R3-CD, 2024 WL 4786206, at *7 (Tenn. Crim. App. Nov. 14, 2024) (citations omitted), *no perm. app. filed*.

Further, Defendant Bailey does not acknowledge the waiver or request plain error review, and we decline to do so here. *See State v. Morgan*, 727 S.W.3d 182, 198 (Tenn. Crim. App. 2025) (declining to exercise plain error review when the defendant did not request it). Defendant Bailey is not entitled to relief on this basis.

---

[13] We note that one of the stated issues in both Defendants' identical motions for new trial was, "The [c]ourt erred in overruling Defendant's objection to the admission of text messages from [D]efendant . . . Bailey to the [victim.]" At the motion for new trial hearing, Defendant Holland's counsel framed the issue as one of "a constitutional right in the confrontation clause to cross-examine witnesses." Defendant Bailey's counsel generally adopted Defendant Holland's arguments and did not explicitly discuss Defendant Bailey's text message exchange with the victim.

- 33 -

## 2. *Detective Goble's body camera recording*

Relative to Detective Goble's body camera recording of the neighbor's doorbell video, Defendant Bailey contends that the defense "was stripped of the opportunity to see or hear something that could challenge evidence presented or even exonerate" her, and states without elaboration that the recording "may very well be the most critical piece of evidence in this trial." She argues that to "submit a video of a video of a video and have it introduced as evidence is profoundly inappropriate"; that CPD took no measures to preserve the original recording; and that the failure to conduct "a thorough and complete investigation is nothing short of negligent." The State responds that the trial court properly admitted the recording.

Defendant Bailey bases her argument in Tennessee Rule of Evidence 1002, also known as the best evidence rule. Rule 1002 provides, in relevant part, that to prove the content of a recording, the original recording is required. Tennessee Rule of Evidence 1003 adds, however, that a "duplicate is admissible to the same extent as an original unless a genuine question is raised as to the authenticity of the original." A duplicate, in relevant part, "is a copy produced . . . by electronic re-recording . . . which accurately reproduce[s] the original." Tenn. R. Evid. 1001(4). "The best evidence rule is a rule of preference rather than exclusion. It does not exclude evidence but rather requires the introduction of the best available form of the evidence." *Iloube v. Cain*, 397 S.W.3d 597, 602 (Tenn. Ct. App. 2012) (internal quotation marks and citations omitted); *see State v. Smith*, No. M2017-00216-CCA-R3-CD, 2018 WL 4026496, at \*9 (Tenn. Crim. App. Aug. 22, 2018), *perm. app. denied* (Tenn. Jan. 17, 2019).

Defendant Bailey has not questioned the authenticity of the original doorbell camera recording; instead, she complains that the original doorbell recording might have had more value to the defense than the recording introduced at trial. Her issue relates to the State's duty to preserve evidence, which she does not raise or argue on appeal, and the defense theory that law enforcement's investigation was faulty, which goes to the weight of the evidence rather than its admissibility. *See State v. Long*, No. W2016-02471-CCA-R3-CD, 2018 WL 3203124, at \*13 (Tenn. Crim. App. June 29, 2018) (denying relief on a best evidence rule issue when the "record before us does not reflect that the Appellant questioned the authenticity of the original video recording or the authenticity of the photographs" and noting that the defendant's "complaints about the photographs being taken out of context do not relate to their admissibility and instead concern the weight to be attributed to the photographs"). We note that the recording introduced at trial was far from "the most critical piece of evidence"—it did not show the shooting and only captured faint beams of light, the sound of rapid gunfire, and a car's driving away, which had already been testified to by multiple witnesses.

The trial court did not abuse its discretion by overruling the best evidence rule objection. Defendant Bailey did not raise a genuine question as to the authenticity of the original recording; therefore, the duplicate, in the form of the body camera recording, was admissible to the same extent as an original. *See* Tenn. R. Evid. 1003. Defendant Bailey is not entitled to relief on this basis.

### 3. *Autopsy photographs*

Defendant Holland contends that the trial court erred by admitting the autopsy photographs. He asserts that the autopsy photographs were irrelevant to the charges against him and that they were "graphic," "unnecessary," and "unduly gruesome." He avers that the photographs only had minimal probative value of premeditation and that any probative value was cumulative to Dr. Bowman's testimony. Defendant Holland argues that because the evidence in this case was circumstantial, the admission of the photographs was not harmless.

Defendant Bailey contends that the only purpose for introducing the photographs was to inflame the passions of the jury and echoes that Dr. Bowman's testimony, the autopsy diagram, and x-ray provided an adequate, detailed description of the victim's injuries. Defendant Bailey argues that the photographs did not assist Dr. Bowman. Both Defendants note that neither of them disputed the victim's cause of death or injuries.

The State responds that the trial court properly admitted the photographs and that Defendant Bailey has waived plenary review of this issue for failure to contemporaneously object.

Tennessee Rule of Evidence 401 states that evidence is relevant when it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Tenn. R. Evid. 401. "Our Rules of Evidence provide that relevant evidence is generally admissible while irrelevant evidence is not." *State v. Kiser*, 284 S.W.3d 227, 262 (Tenn. 2009); s*ee* Tenn. R. Evid. 402. However, even if the evidence is relevant, it "may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury[.]" Tenn. R. Evid. 403.

Photographs must never be used "solely to inflame the jury and prejudice them against the defendant." *State v. Banks*, 564 S.W.2d 947, 951 (Tenn. 1978). Evidence which only appeals to the sympathies of the jury, conveys a sense of horror, or "engenders an instinct to punish" should be excluded. *State v. Collins*, 986 S.W.2d 13, 20 (Tenn. Crim. App. 1998). Factors to be considered when determining whether the probative value of photographs of homicide victims outweighs their prejudicial effect include:

[T]he value of the photographs as evidence, that is, their accuracy and clarity, and whether they were taken before the corpse was moved, if the position and location of the body when found is material; the inadequacy of testimonial evidence in relating the facts to the jury; and the need for the evidence to establish a prima facie case of guilt or to rebut the defendant's contentions.

*Banks*, 564 S.W.2d at 951. "The more gruesome the photographs, the more difficult it is to establish that their probative value and relevance outweigh their prejudicial effect." *Id.* "As a general rule, where medical testimony adequately describes the degree or extent of an injury, gruesome and graphic photographs should not be admitted." *Collins*, 986 S.W.2d at 21 (citing *State v. Duncan*, 698 S.W.2d 63, 69 (Tenn. 1985)). Photographic evidence may be excluded when it does not add anything to the testimonial description of the injuries. *Banks*, 564 S.W.2d at 951.

Whether the admission of autopsy photographs constitutes reversible error requires a two-step analysis. First, we must determine whether the photographs were relevant to an issue the jury would be required to determine and whether their probative value was substantially outweighed by the danger of unfair prejudice. *See Banks*, 564 S.W.2d at 951; *Collins*, 986 S.W.2d at 20. "Unfair prejudice" is defined as "[a]n undue tendency to suggest decision on an improper basis, commonly, though not necessarily, an emotional one." *Banks*, 564 S.W.2d at 951 (quoting Advisory Committee Note to Federal Rule of Evidence 403). Second, if the trial court abused its discretion and erred in admitting the photographs, we must determine whether such error was harmless. *See Banks*, 564 S.W.2d at 952-53; *Collins*, 986 S.W.2d at 21-22. "[T]he admissibility of photographs lies within the discretion of the trial court," whose ruling "will not be overturned on appeal except upon a clear showing of an abuse of discretion." *Banks*, 564 S.W.2d at 949.

In this case, we cannot conclude that the trial court abused its discretion by admitting the autopsy photographs. The autopsy photographs corroborated Dr. Bowman's description concerning the degree or extent of the injuries. The photographs themselves were not gruesome or overly graphic. *Collins*, 986 S.W.2d at 21. The State was entitled to present evidence of premeditation, including documenting the victim's numerous injuries. The victim's wounds had been cleaned such that no blood was visible, and the victim's head and face injuries did not disfigure him. This is firmly a situation in which "reasonable minds can disagree with the propriety of the decision," and we therefore affirm the trial court's decision. *Harbison*, 539 S.W.3d at 159. Defendant Holland is not entitled to relief on this basis.

Further, we agree with the State that Defendant Bailey did not lodge a contemporaneous objection to the autopsy photographs. "This [c]ourt has previously determined that an objection by a co-defendant does not relieve the other defendant of the

- 36 -

obligation to enter a contemporaneous objection in order to preserve an issue for an appeal on [her] behalf." *State v. Santillan*, No. M2020-00074-CCA-R3-CD, 2021 WL 3422981, at *3 (Tenn. Crim. App. Aug. 5, 2021) (citations omitted), *no perm. app. filed*. We note that Defendant Bailey has not responded to the State's waiver argument or requested plain error review. "Where a defendant fails to respond to a waiver argument, only particularly compelling or egregious circumstances could typically justify our sua sponte consideration of plain error relief." *Morgan*, 727 S.W.3d at198 (quoting *State v. Ruiz*, 716 S.W.3d 439, 454 (Tenn. Crim. App. 2024) (citation and quotation marks omitted)). No such circumstances exist here, and we could decline to consider the issue at all. *See id*. However, because we considered the issue on its merits above and concluded that no abuse of discretion occurred, we will briefly note that no clear and unequivocal rule of law was breached and that Defendant Bailey is not entitled to plain error relief.

### C.     Confrontation/Agent Anderson's Testimony

Defendant Holland contends that his right to confront witnesses was violated when Agent Anderson testified in Agent Davis's place, citing the United States Supreme Court's June 2024 opinion in *Smith v. Arizona*, 602 U.S. 779 (2024). The State responds that Defendant Holland has waived plenary review of this issue for failure to make a contemporaneous objection at trial and that he is not entitled to plain error relief.

At oral argument, Defendant Holland's counsel claimed that this issue was properly preserved by his objection to Agent Anderson's using bench notes that had not been disclosed in discovery. Counsel's argument is not well-taken, as the transcript speaks for itself in this regard. During Agent Anderson's testimony, she set out the TBI's technical peer review process, stated that Agent Davis performed the GSR testing but was unavailable to testify, and testified without objection to the results of both the initial GSR testing of Defendant's swabs and the subsequent testing of the knit hat found at Lincoln Homes. Only when the State handed Agent Anderson Agent Davis's bench notes did Defendant Holland object.

At the bench conference, Defendant Holland's counsel stated that the parties knew in advance of trial that Agent Anderson would be testifying as a "pinch-hitter" but that the bench notes had not been disclosed in discovery. Counsel expressed concern that he "was not informed that she was strictly going to be testifying from the notes made by somebody else." Counsel continued, "I thought all that was being entered was . . . the report" and moved to strike the testimony "as evidence that was not provided to us at all." The prosecutor responded that he did not provide the bench notes to Agent Anderson until "after the testimony . . . of each report." The trial court excluded the bench notes due to the discovery violation, but neither Defendant objected to Agent Anderson's testifying to the contents of the reports themselves. Accordingly, no confrontation issue was raised until the motion for new trial, and it is subject to plain error review only. *See* Tenn. R. App. P.

36(a); *cf. State v. Green*, No. W2024-00370-CCA-R3-CD, 2025 WL 2027873, at *4 (Tenn. Crim. App. July 21, 2025) (concluding that counsel's objection preserved the defendant's confrontation clause issue for appeal when counsel approached the trial court, stated that he had just learned that the State was calling a substitute for the sole named witness, averred that calling "someone different" would "deprive [the defendant] of his right to confront and cross-examine his accusers," and requested a mistrial and dismissal of the case), *no perm. app. filed*.

Plain error relief is "limited to errors that had an unfair prejudicial impact which undermined the fundamental fairness of the trial." *State v. Adkisson*, 899 S.W.2d 626, 642 (Tenn. Crim. App. 1994). In order to be granted relief under plain error relief, five criteria must be met: (1) the record must clearly establish what occurred in the trial court; (2) a clear and unequivocal rule of law must have been breached; (3) a substantial right of the accused must have been adversely affected; (4) the accused did not waive the issue for tactical reasons; and (5) consideration of the error is "necessary to do substantial justice." *Id.* at 640-41; *see also State v. Smith*, 24 S.W.3d 274, 282-83 (Tenn. 2000) (Tennessee Supreme Court formally adopting the *Adkisson* standard for plain error relief). When it is clear from the record that at least one of the factors cannot be established, this court need not consider the remaining factors. *Smith*, 24 S.W.3d at 283. The defendant bears the burden of persuasion to show that she is entitled to plain error relief. *State v. Bledsoe*, 226 S.W.3d 349, 355 (Tenn. 2007).

In this case, we conclude that plain error relief is unwarranted because consideration of the error is not necessary to do substantial justice. Our supreme court has held that "a conclusion that substantial justice requires relief would imply a significant probability that the jury would have acquitted the [d]efendant had the disputed testimony not been admitted." *State v. Vance*, 596 S.W.3d 229, 256 (Tenn. 2020). We conclude that, even if the GSR evidence were not introduced, no significant probability existed that the jury would have acquitted Defendant Holland. Defendant Holland's cell phone location data placed him in the victim's neighborhood immediately before the shooting and tracked his flight from the neighborhood to Madison Street, where he encountered Agent Jackson and Sergeant McClung. Defendant Holland was driving the stolen Jeep, which Mr. Holler later identified as the vehicle he saw speeding away from the shooting scene. As we discussed above, the evidence indicated that Defendant Bailey was with Defendant Holland in the Jeep while she lured the victim out to meet her using social media messages. When Agent Jackson and Sergeant McClung initiated a traffic stop of the Jeep, Defendant Holland fled, ultimately "bailing out" at Lincoln Homes with his three passengers and continuing to flee on foot. The surveillance recording reflects that Defendant Holland was the only one who ran through the middle of the grassy area where the Glock pistol was found. Agent Hall matched the Glock to all the .40 caliber shell casings and projectiles recovered at the crime scene and at autopsy. We note that Agent Anderson's testimony included that the presence of GSR on Defendant Holland's person did not necessarily mean that he was the shooter,

only that he had handled a gun or been near one when it was discharged. Defendant Holland is not entitled to plain error relief.

### D. Jury Instructions

It is well-established Tennessee jurisprudence that the trial court "has the duty of giving a correct and complete charge of the law applicable to the facts of the case" and that a defendant has "the right to have every issue of fact raised by the evidence and material to the defense submitted to the jury upon proper instructions by the trial court." *State v. Green*, 995 S.W.2d 591, 604-05 (Tenn. Crim. App. 1998) (citations omitted). The right is constitutional in nature. *State v. Teel*, 793 S.W.2d 236, 249 (Tenn. 1990), *superseded by statute on other grounds as stated in State v. Reid*, 91 S.W.3d 247, 291 (Tenn. 2002). Whether jury instructions are sufficient is a question of law, which we review de novo with no presumption of correctness. *State v. Clark*, 452 S.W.3d 268, 295 (Tenn. 2014).

#### 1. Identity

##### i. Defendant Holland

Defendant Holland contends that the trial court erred by failing to give a general instruction on identity contained in 7 Tennessee Pattern Jury Instructions—Criminal § 42.05(a), arguing that identity is an element of the offenses and that the lack of an identity instruction combined with the criminal responsibility instruction "permitted the State to avoid proving who shot [the victim] at all." The State responds that the trial court properly instructed the jury and that a general identity instruction was not required.

7 Tennessee Pattern Jury Instructions—Criminal § 42.05(a), entitled, "Alternative instruction: When identification not material," reads:

> The Court charges you that the identity of the defendant must be proven in the case on the part of the State to your satisfaction beyond a reasonable doubt. In other words, the burden of proof is on the State to show that the defendant now on trial before you is the identical person who committed the alleged crime with which *[he][she]* is charged. In considering the identity of a person, the Jury may take into consideration all the facts and circumstances in the case.

> The Court further charges you that if you are satisfied from the whole proof in the case, beyond a reasonable doubt, that the defendant *[]* committed the crime charged against *[him][her]*, and you are satisfied beyond a reasonable doubt that *[he][she]* has been identified as the person who

committed the crime charged, then it would be your duty to convict *[him][her]*. On the other hand, if you are not satisfied with the identity from the proof, or you have a reasonable doubt as to whether *[he][she]* has been identified from the whole body of the proof in the case, then you should return a verdict of not guilty.

First, we note that Defendant Holland's objection at trial did not clearly refer to this general identity instruction. Regardless, Defendant Holland did not raise *any* issue related to a missing identity instruction until after the jury retired to deliberate. "Tennessee courts have held . . . that, '[a]s a general rule, no assignment of error based upon omission or inadequacy of the judge's instructions to the jury will be considered unless a special request was tendered.'" *State v. Jarman*, 604 S.W.3d 24, 48 (Tenn. 2020) (quoting *State v. Reece*, 637 S.W.2d 858, 861 (Tenn. 1982) (citations omitted)); *see* Tenn. R. App. P. 36(a) (stating that "[n]othing in this rule shall be construed as requiring relief to be granted to a party responsible for an error or who failed to take whatever action was reasonably available to prevent or nullify the harmful effect of an error"). Accordingly, this issue has been waived. Defendant Holland is not entitled to relief on this basis.

### ii. *Defendant Bailey*

Defendant Bailey argues that the trial court erred by failing to give the pattern jury instruction on identity as a material issue. The State responds that "identity was not a material issue because the only eyewitness testimony needing corroboration was that of the Jeep leaving the scene with a blonde woman in the front seat."

In *State v. Dyle*, 899 S.W.2d 607, 612 (Tenn. 1995), the Tennessee Supreme Court promulgated a comprehensive jury instruction to be used in cases where identity is a material issue. The instruction, which was later incorporated into the Tennessee Pattern Jury Instructions, sets forth a list of factors for the jury to consider in determining whether the State has met its burden of proving "identification of the defendant as the person who committed the crime." *Id.*; *see* T.P.I.—Crim. 42.05. Those factors include:

(1) The witness' capacity and opportunity to observe the offender. This includes, among other things, the length of time available for observation, the distance from which the witness observed, the lighting, and whether the person who committed the crime was a prior acquaintance of the witness;

(2) The degree of certainty expressed by the witness regarding the identification and the circumstances under which it was made, including whether it is the product of the witness' own recollection;

(3) The occasions, if any, on which the witness failed to make an identification of the defendant, or made an identification that was inconsistent with the identification at trial; and

(4) The occasions, if any, on which the witness made an identification that was consistent with the identification at trial, and the circumstances surrounding such identifications.

*Dyle*, 899 S.W.2d at 612.

The *Dyle* Court held that this instruction must be given when identification is a material issue, and it is requested by the defendant. *Id.* Failure to give the instruction under these circumstances is plain error. *Id.* However, if identification is a material issue and the defendant does not request the instruction, the failure to give the enhanced instruction will be reviewable "under a Rule 52 harmless error standard."[14] *Id.* Identity is a material issue "when the defendant puts it at issue or the eyewitness testimony is uncorroborated by circumstantial evidence." *Id.* n.4.

In this case, we note that the State's argument focuses on the corroborating evidence of Mr. Leslie's identification of a blonde individual in the Jeep. However, *Dyle* instructs that the special instruction is to be given when a defendant puts identity at issue *or* the eyewitness testimony is uncorroborated by circumstantial evidence. Defendant Bailey squarely put her identity as the perpetrator at issue. Defendant Bailey's defense theory, as stated in her opening argument, was that CPD conducted an "incomplete, inconsistent investigation" and "got it wrong." Defendant Bailey cross-examined the State's witnesses about their inability to identify her as one of the Jeep's occupants or confirm that she was the one using her cell phone to contact the victim. She also elicited from the TBI witnesses that the physical evidence did not establish when she had been inside the Jeep. In her closing argument, Defendant Bailey's counsel emphasized that no witnesses could identify Defendant Bailey as having been involved in the shooting and that Sergeant McClung and Agent Jackson contemporaneously described the Jeep's passengers as four males. Accordingly, Defendant Bailey put identity at issue, and the trial court should have included the *Dyle* instruction.

---

[14] The text of Rule 52 ("Harmless Error and Plain Error") of the Tennessee Rules of Criminal Procedure was deleted in 2009, and harmless error and plain error standards are now covered by amended Tennessee Rule of Appellate Procedure 36(b). *See State v. Young*, No. M2015-00712-CCA-R3-CD, 2016 WL 125825, at *7 (Tenn. Crim. App. Jan. 12, 2016) (analyzing a trial court's failure to provide the *Dyle* instruction when it was not requested under "the non-constitutional harmless error standard of" Rule 36(b)), *perm. app. denied* (Tenn. May 5, 2016).

However, Defendant Bailey's counsel did not request that the *Dyle* instruction be given before the jury retired to deliberate. As a result, we will review this issue under a harmless error standard. *See id.*

We conclude that the failure to include the *Dyle* instruction was harmless because the evidence "supported the reliability of the eyewitness identification in this case." *Young*, 2016 WL 125825, at *7 (concluding that the failure to issue a *Dyle* instruction was harmless when the circumstances of the identification and corroborating evidence established that the defendant was the person who committed the offenses). There were no eyewitnesses to the shooting, but Mr. Leslie testified that he saw a person with blonde hair in the Jeep. When the Jeep was searched, officers found an orange artificial fingernail in the front passenger floorboard. Detective Goble testified that, when he arrested Defendant Bailey, she had blonde hair and an incomplete set of orange artificial fingernails. Defendant Bailey's DNA was also found on the front passenger interior door handle. Thus, Defendant Bailey's identity as the person Mr. Leslie saw inside the Jeep was corroborated by the testimony and physical evidence. Additionally, Defendant Bailey's involvement in the victim's murder was established by her social media messages asking the victim to meet her alone in his neighborhood. We note that the State's theory of the case was that Defendant Bailey was criminally responsible for the victim's murder, and the jury was instructed on criminal responsibility. The trial court's error was harmless, and Defendant Bailey is not entitled to relief on this basis.

## 2. *Flight*

"In order for a trial court to charge the jury on flight as an inference of guilt, there must be sufficient evidence to support such instruction." *State v. Berry*, 141 S.W.3d 549, 588 (Tenn. 2004). The pattern jury instruction on flight is as follows:

> The flight of a person accused of a crime *[other than evading arrest]* is a circumstance which, when considered with all the facts of the case, may justify an inference of guilt. Flight is the voluntary withdrawal of oneself for the purpose of evading arrest or prosecution for the crime charged. Whether the evidence presented proves beyond a reasonable doubt that the defendant fled is a question for your determination.

> The law makes no precise distinction as to the manner or method of flight; it may be open, or it may be a hurried or concealed departure, or it may be a concealment within the jurisdiction. However, it takes both a leaving the scene of the difficulty and a subsequent hiding out, evasion, or concealment in the community, or a leaving of the community for parts unknown, to constitute flight.

If flight is proved, the fact of flight alone does not allow you to find that the defendant is guilty of the crime alleged. However, since flight by a defendant may be caused by a consciousness of guilt, you may consider the fact of flight, if flight is so proven, together with all of the other evidence when you decide the guilt or innocence of the defendant. On the other hand, an entirely innocent person may take flight and such flight may be explained by proof offered, or by the facts and circumstances of the case.

Whether there was flight by the defendant, the reasons for it, and the weight to be given to it, are questions for you to determine.

*See* 7 Tenn. Prac. Pattern Jury Instr. T.P.I.-Crim § 42.18. The trial court issued this instruction except for the bracketed language.

### i.    *Defendant Holland*

Defendant Holland contends that the trial court's flight instruction was erroneous because it did not include language that the instruction should not be applied to the evading arrest charges in Counts 2 and 4. The State responds that any error in failing to limit the flight instruction was harmless because the fact of the flight was uncontested by either Defendant and the evidence of Defendants' flight was overwhelming.

In *State v. Smith*, our supreme court held that, when a defendant was charged with evading arrest and other offenses, a trial court's failure to limit the flight instruction to the charged offenses other than evading arrest was harmless when the flight instruction included that "flight alone does not allow you to find that the defendant is guilty of the crime charged" and the State's evidence related to evading arrest was "overwhelming." 492 S.W.3d 224, 248-48 (Tenn. 2016). We reach the same conclusion here. Although the trial court should have included the bracketed limiting language, the jury was properly instructed that flight alone did not justify a guilty verdict, and the evidence related to Counts 2 and 4 was overwhelming. Agent Jackson and Sergeant McClung testified that, when they initiated a traffic stop of the Jeep driven by Defendant Holland, Defendant Holland sped up and drove a distance before "bailing out" of the Jeep with his passengers at Lincoln Homes. After exiting the car, Defendant Holland continued fleeing on foot, as captured by the Lincoln Homes surveillance recording, and Sergeant McClung testified that he found Defendant Holland hiding in the shadows by a storage shed. The trial court's error was harmless, and Defendant Holland is not entitled to relief on this basis.

### ii.    *Defendant Bailey*

Defendant Bailey argues that the flight instruction should not have been given at all because "charging the jury with . . . flight was unsupported by the facts and placed an

inference of guilt where there was not one." The State responds that the evidence fairly raised flight.

In *Jones v. State*, this court stated:

It is universally recognized that testimony as to flight, attempted flight, or concealment after the commission of an offense or after one is accused of a crime is relevant evidence which may be shown as a criminating circumstance, particularly where such conduct is apparently inconsistent with the idea of innocence.

580 S.W.2d 329, 332 (Tenn. Crim. App. 1978) (citing 22A C.J.S. Criminal Law § 625 (1961)). The evidence in this case was that Defendant Bailey had blonde hair and an incomplete set of orange artificial fingernails at the time of her arrest. Her DNA and an orange artificial fingernail were found inside the Jeep, and Mr. Leslie testified that he saw a person with blonde hair in the Jeep as it fled the shooting scene. Sergeant McClung and Agent Jackson testified that the Jeep sped away when they initiated a traffic stop and that four people "bailed out" of the Jeep at Lincoln Homes and fled on foot. The Lincoln Homes surveillance recording showed four people running through the area, followed by three officers. Only Defendant Holland was apprehended at Lincoln Homes; Defendant Bailey was later located at her home. There was sufficient evidence for the trial court to instruct the jury on flight, and the trial court properly instructed the jury that it was for the jury to determine whether there was flight by Defendant Bailey, the reasons for it, and the weight to be given to it. Defendant Bailey is not entitled to relief on this basis.

### E. Clerical error

We have determined that a clerical error exists on Defendant Holland's judgment form for Count 2. The trial transcript and verdict sheet reflect that Defendant Holland was convicted as charged of evading arrest while operating a motor vehicle creating a risk of death or serious bodily injury, a Class D felony. *See* Tenn. Code Ann. § 39-16-603(d)(2)(B). At the sentencing hearing, the trial court found that Defendant Holland was a Range I offender and imposed a two-year sentence to be served concurrently with Counts 1, 3, and 4. However, the judgment for Count 2 states that the conviction offense is Class A misdemeanor evading arrest and shows a sentence of eleven months, twenty-nine days. We remand the case for entry of corrected judgment in Count 2 showing a Class D felony conviction and two-year sentence.

### III. Conclusion

Based upon the foregoing, we affirm the judgments of the trial court and remand Defendant Holland's case for entry of a corrected judgment in Count 2.


_____s/_Robert L. Holloway, Jr._
ROBERT L. HOLLOWAY, JR., JUDGE